The United States Court of Appeals for the Ninth Circuit is now in session. Good afternoon, gentlemen. We're here this afternoon to hear argument in the Atwood case and you may proceed. May it please the court, Joseph Perkovich for Frank Atwood. And you may proceed, Mr. Perkovich. Thank you. And I would just like to reserve five minutes for rebuttal of my time. All right. I'll try to help watch the clock. But do you see the clock as well? I do. I do. All right. Thank you. Thanks, Judge. We have two rulings before the court. Both have their complexities. The preliminary injunction was denied, as well as a jurisdictional question of standing with respect to the lethal gas challenge. If the court has a preference as to which matter to address first in questions, I'm certainly happy to field them. Well, I would just ask you maybe to short circuit something. And that is with respect to the standing. Why aren't we bound by our precedent in CRO v. Terhune? The Supreme Court of the United States, of course, created a conundrum, to put it mildly, by stating that the election of a method is waiver of means to challenge that method, which followed Terhune. And that presents the fundamental problem here, which requires an articulation of when standing ripens to present a challenge. Otherwise, the state would continue to be unfettered in designating gas, irrespective of constitutional problems. If the state offered or a state offered only cyanide gas, then I assume there would be no standing issue and a capital defendant could challenge the constitutionality of that. So there isn't really a concern that would go unchallenged if that was the only method being offered by the state. Isn't that correct? That's correct, Your Honor. The problem is that the Arizona Constitution entitles Mr. Atwood and others in his position, the choice, the state shall have or the condemned shall have the choice of either injection or gas. Right, but that leaps from the standing issue to a completely different issue. So the constitution, the state constitution offers a choice, they've given a choice. One of the choices you would like to argue is unconstitutional, but that's not the standing issue before us. Your Honor, I beg to differ. In order to have his right to choose, he has to have constitutional options. And so he would be forced to elect an unconstitutional method. And it's been settled that he cannot challenge it. This necessity for a choice is brought to bear by the problems with lethal injection, for one thing, but irrespective of those problems. And of course, we can spend considerable time addressing them today as well. He has attempted to make a choice of lethal gas, which is the choice that's provided to him by the constitution and the statute. The problem is the state's designation of cyanide gas as that gas. And so he has no means to actually affect his... Can you just stop there and tell me how he has attempted to make that designation? We have written demand letters during the pendency of the warrant on May 14th and May 18th, presenting the issue to the state, demanding a constitutional gas and also insisting though, for clarity's sake, so that he's not subjected to cyanide gas, that we are not electing gas as it has been designated under the current protocol. But you didn't make that. I mean, in effect, you made no election, which went to the default, correct? With respect to lethal injection. That's right, Your Honor. And so it becomes almost a semantic question because we're foreclosed from choosing lethal gas by virtue of how that gas is designated by the state. They've chosen a gas that this court has affirmed is unconstitutional. All right. You want to proceed with your other arguments? Yes, Your Honor. With respect to the preliminary injunction, what we have is a disregard for the evidence that was put on with respect to first the restraint and then critically the pharmaceuticals, the drugs. With respect to the restraint, the court ignored the evidence, which was clear that absent being in a seated position, being forced to be in a supine position, as the protocol clearly requires, Mr. Atwood will be in extreme pain from the moment he's restrained to the conclusion of the process. And he will be restrained prior to even the administration of drugs, assuming that the IV insertions go properly for close to an hour. And so proceeding under the protocol, as is currently contemplated, will engage an Eighth Amendment violation for upwards of an hour even before the lethal injection proceeds. And the state put forward no evidence to the contrary with respect to this question of restraint. Rather, they submitted photographs of what they intended to do with the execution table. They submitted snapshots from video rather than video itself, showing our client asleep and with one leg bent. So they had several photographs showing a bent leg as opposed to two bent legs to assert the proposition that he's capable of being in a position with not both legs in a 90-degree angle. That does not- My understanding is that they have offered up this medical pillow, but have now said that they would permit one leg to be bent if the court so ordered. Is that accurate? Yes, which I'm confounded by. To present an offer at this point on appeal when the court below took evidence on this matter and the state refused to put forth any evidence of a medical quality or otherwise to rebut the evidence that our medical expert put forward with respect to the pain question, which is the question here, with respect to the restraint facet of the lethal injection protocol. And now it's almost as if we're hoping this is an arbitration or some sort of mediation before this panel, which is not how this works, of course. No, it's not how it works, but the reality in these cases is that there often is a moving landscape. And so I assume hypothetically, if the court were to rule against you on your Eighth Amendment claim on the pain, that you would want the bent leg. Is that correct? No, Your Honor. First of all, the protocol is very clear. We put forward execution laws for Mr. Dixon's. Okay. No, I want to go back to my question and then you can go back and tell me about the history. My question is, in addition to the pillow, if the state were to order and assuming just hypothetically that you didn't prevail on your Eighth Amendment claim, if the court were to order the bent knee, which the state has now offered up, are you saying you would reject that? Yes, Your Honor. And the reason for this is there are multiple reasons, but I was pointing to the history of this because it's very clear they're under the protocol. In order for the state to competently insert IVs, they have always maintained that restraint is paramount. That's why we submitted he needs to be seated. There's a way forward for an orderly planning of this, not ad hockery at the 11th hour to- I'm a little surprised at your answer, so let me just go back because we have in the record that this wheelchair poses risks. If that were the option that actually were adopted, that that poses its own risks. Do you agree with that evidence? So I will focus on the chief problem with the free leg here, and that is the protocol contemplates peripheral IV inserts or a central femoral line. With Mr. Dixon, the IV team, and this is the recent execution last month, after 11 minutes, which is a very modest amount of time, in a rushed way, moved to insert a femoral line in the right groin of Mr. Dixon. The record reflects that with Mr. Dixon's left leg moving because of the protocol and the IV considerations, an execution team member put his body weight on Mr. Dixon's leg to keep it from moving, right? So in a scenario where it's foreseeable, if not a foregone conclusion that a femoral line will be put in, the prospect of a free leg is dangerous. It's dangerous because when we look at botched executions, in fact the one eight years ago before this, the evidence strongly suggests that one of chief problems for Mr. Wood being on the execution table for two hours was the IV insertion. 15 injections were made. Okay, so I just want to, I have a really simple question, so I hope you can get to the bottom line answer. Given the district court's finding that there wouldn't be level of pain rising to the level of the eighth amendment, the state had during the district court hearing the pillow before it, and it included that as an accommodation. But as I understand you now, you're saying that even if you were to lose on that claim, you would not accept the state's offer with respect to a bent leg. Is that correct? It's dangerous to have a bent leg. My question is a yes or no question because we are running the clock here, and I'd like to understand your answer. It's no, and I don't want to see them seem unreasonable by saying no. That's your choice. It's you and your client. I'm not suggesting you're unreasonable. I just want to know the answer, that's all. Your honor, I'm trying to explain why. You look at the locket failed execution in Oklahoma in 2014. It's a failure of the IV insert, and that's why the execution team is very clear that restraint is important. So unless the state says we will not put a femoral line under no circumstances, and that we will be left to peripheral lines, in other words, insertions into the arms under its protocol, we certainly can't entertain a free leg because there are medical reasons why the restraint goes that way under normal circumstances. This is why we flagged this issue. If I understand your argument, you were raising the bent leg from the photos to try to undermine the state's evidence that Mr. Atwood would not be in severe pain as long as he was propped up. Is that correct? Well, our point was that our evidence before the hearing and during the hearing was he needs to be seated. The state came forward with photographs showing that he had a leg up as opposed to both legs up at all times. It showed four snapshots from 24-hour surveillance to stand for the proposition that he would not be in extreme pain if presumably one leg was propped up. His head and shoulders were propped up on pillows or the like. As I understand the argument, he was not flat on his bed, but was sleeping comfortably propped up, or what the photo showed. And so the state says, well, we will provide items to prop him up on the table. And I thought your argument was that's not enough. See, his leg is bent and so it isn't really being propped up. Let me clarify that. That's not our argument. That's the state's argument. Our position has been and was evidenced at the hearing that a seated position is necessary because his legs need to be in a bent position. The curvature of the spine to minimize the pain so that it's not like one encounters when they are laid out flat on the table involves not only the torso, but the legs. The state's proposition with respect to the pillow does not address the legs. And so below the waist is essential to this pain question. Now, the state pointed to one bent leg as evidence that he would be okay if both of his legs were straightened and strapped and conducted. It's at the 11th hour here on their brief that they first introduced after we've raised this for ages. In fact, it was a subject of 1983 litigation two years ago, his spine, that they could free up one leg. And I'm saying it's dangerous and it's a non-starter for that reason because of the proclivity for using the femoral line. So the district court rejected the bent one or two bent because it found as a factual finding that the state's accommodations would avoid unconstitutional pain. So if that prevailed, then just to follow up on Judge McKeown's question and the district court's finding was not clearly erroneous, you would not want the state to allow bent leg because that could have other ramifications. Yes, it would be unprecedented. They're unprepared for it. This is the state making that offering as opposed to the people who are actually conducting the execution. It is very clear that both legs need to be restrained when they're ordinarily conducting an execution, it would be dangerous. The other point, and I'm running scarce on my time that I want to turn to, if I may, is in relation to the compounding and the findings with respect to that. And the assertion that there is not a liberty interest in any sort of meaningful treatment of beyond you state or quantitative analysis. We put forward evidence to that effect. The state did not put forward counter evidence and in fact has backed off entirely actually demonstrating that they have adequacy with respect to those metrics, those baselines that were hashed out in a long fought agreement after the Wood execution. They backed off to say that we have no entitlement to any meaningful BUD rather. What information did the state provide you? The execution protocol itself, as the district court pointed out, is pretty bare bones. So what information did the state give you to meet those requirements? They did it in the context of other litigation as opposed to, you know, willingly I would submit that first, but they provided third-party lab testing of certain metrics, not an explication of the actual specialized testing that was done. And what's more, to back up, the specialized testing as it was called was done in order to come up with a beyond you state to be assigned to subsequently prepared batches. That specialized testing failed. It did not fall within the parameters of the pharmaceutical standard. So it was an inadequate test that would not, the batch would not be used on people. And that has been the basis for their assertion, as far as we can make of it, of 180 day beyond you state. So they are relying on a failed test to assign a beyond you state purportedly. Is that test the one that showed the 10.6? Yes, your honor. And again, that's a result that would not be used on people. I have less than three minutes left, so I'm going to keep that time, if I may. Yes, you may. Mr. Sparks. Good afternoon, your honors. Jeff Sparks on behalf of the defendants at police. I can maybe pick up on the issues regarding the compounded penal barbital first. So there's really two parts to the district court's decision. On that first, you know, whether or not there is a due process liberty interest created by the state's execution procedures, you know, turning to that and looking at the case law that plaintiff presented in support of that theory. All of those decisions are involving things like the decision to revoke parole or probation, whether an inmate has forfeited good time credits, a decision to impose solitary confinement, the decision to assign a defendant or an inmate to a supermax prison. In other words, the consistency in those cases seems to be some kind of, you know, quasi judicial decision making process. And it's when there are governing those decisions, then the court has found that there can be a due process liberty interest created by state law. Here we have something that's very different. We have procedures created by the Arizona Department of Corrections that outline how it's going to carry out an execution. And really at bottom here, what the concern is, is the Eighth Amendment. And I think it's clear, not only the settlement agreement that was subject of this claim in the district court, but also the Department of Corrections execution procedures that are in many ways based on that settlement agreement. The thrust of those provisions is to protect an inmate's Eighth Amendment rights. Here Atwood has not presented an Eighth Amendment claim with the evidence. I would argue the evidence isn't there. There's no evidence to suggest that there's any risk of pain caused by the execution drugs here. He argues that the Postal Council says if the drugs are not properly compounded, then there is a risk of excruciating pain. That's the argument. Correct. That is the argument. There was no evidence presented at the the expert testimony on that point was if there are problems, there could be pain. There was no testimony that there are problems and there will be pain, which I think would be required to establish a likelihood of success on an Eighth Amendment claim. Can you explain to me? I think it's troubling if I have the record correct that in April 21, with respect to this compounding, said there was a 90 day beyond use date. Then a couple months later in June 21, it was 45 days. And by January of this year, it was 90 days. And now it's 180 days. How can these varied numbers come to pass and the state confidently say that there's a 180 day BUD? Well, to start backwards, the 180 day is based on testing. And that's why over time, that number increased because as the time over which the drug was tested, then it was established that it had a beyond use date up to that point in time that the testing occurred. So that explains, I think, the changing timeframes. Here, the execution protocol and the settlement agreement require that the Department of Corrections only use a drug that is not past its beyond use date. Here, that is the case. The drug that will be used is not past its beyond use date. What about the testing that netted 10.6, whereas that is 0.1 beyond the pharmacological protocol? Where does that test come from? And how does that relate to the 180 days? That's part of the testing that was done. However, the report that that test result is reported on that the compound had a 180 day beyond use date. And that was also certified to you by the pharmacist affidavit that was submitted in the court below. So as far as the Department of Corrections complying with the requirement that it not use a drug that's past its beyond use date, that is the case here. There's no suggestion that the protocol contemplates going beyond that to impose types of requirements or restrictions on how a beyond use date is arrived at. I think the analogy here would be a manufactured drug that came from a manufacturer with the label, like you would buy a bottle of Tylenol at the store has a date on it. There's no, there would be no suggestion the Department of Corrections is not entitled to rely on that as being valid. So what does it count? Go ahead, go ahead, Judge Okuda. The opposing counsel says that that manufactured drug is subject to specific regulations for determining the expiration date and also argues that there's an industry standard for beyond use date in the state has not shown that's met that standard. Well, you know, I don't think there's any requirement that the state has to do that. The requirement is that the state not use expired drugs. And the state has been assured that these drugs are not expired. And so it's complying with any requirements that it is required to follow. So if it says the state of by does the state embrace then the standard, the pharmacological standard that was put forth by the experts for Mr. Atwood? No, I don't think that this well, let me put it this way, the the the information that the Department of Corrections received from the pharmacist who compounded the drug, and that was also provided to Mr. Atwood, you know, stated that that he had followed, you know, all applicable United States pharmacopeia guidelines. And the Department of Corrections doesn't have any reason to dispute that. So in other words, it has received information that the drug it's going to use is not expired. So it's meeting its which exceeds those guidelines that you mentioned. I'm not sure that there is any significance of that. You know, there's been no suggestion that that result alone, you know, creates a substantial risk of severe pain or anything approaching an Eighth Amendment standard. So, you know, I don't think that it so in other words, it doesn't cause an Eighth Amendment problem. And it also, I don't think undermines the Department of Corrections compliance with its requirements. The court doesn't have any additional questions about that issue, I can address the spinal condition related claims. And just by way of providing some explanation, the reason that the state offered in its briefing yesterday, you know, that the potential using of that leg, that's because that was one of Atwood's basis or basis for attacking the district court's findings that the medical wedge pillow that will be placed on the execution table is inadequate. He argued that that's inadequate because the photos that were submitted at the evidentiary hearing showed that he had at least one leg back. So the state here is not trying to subject Mr. Atwood to any unnecessary pain, it's trying to accommodate the claims he's raising while also still carrying out, you know, a lawful execution. So, you know, characterizing it as an 11th hour, well, this is the first time we're hearing that what the district court found is inadequate and that because of the lack of a bent leg. So that's the reason for the state offering that. And as far as Mr. Atwood's proposed alternative of being executed in a seated position, well, his own expert said that a femoral insertion can't be done in a seated position. So to me, that looks less like an actual, you know, feasible proposed alternative than an attempt to stop this execution from happening at all. Because, you know, I think as prior executions have shown, often a peripheral vein is unable to be accessed and a femoral insertion is required in order to go forward with the execution. So I don't think that the seated option is a real feasible option here. Well, based on the argument that you've heard today from Mr. Perkovich and the suggestion in your brief that you would not do the bent leg unless ordered by the court, do I take it to say that Mr. Atwood has rejected that option should he not prevail on other things? Does that mean the state would then not do the bent leg? Is that correct? I believe that is correct, Your Honor. But in context, I think, you know, looking at the district court's decision and the question of whether it abused its discretion or clearly erred in the factual findings that it's the district court's finding that the accommodation that the Department of Corrections has offered satisfies any Eighth Amendment allegation presented here. I just want to go back a little bit to the determination of the beyond use date because you seem to indicate that there was no evidence that there was any issue, but that's precisely what Dr. Ruble's and I probably didn't say that as clearly as I had intended to. The district court found that the execution protocol and the settlement agreement don't include any requirements for how a beyond use date has to be arrived at, no kind of specifications or what the methodology must be. And that's ultimately what the claim is procedures. The Department of Corrections was told by a licensed pharmacist that the drug that will be used will not be expired at the time of the execution. I don't think anything that was presented at the hearing undermines the state's ability to rely on that information, especially in regards to assessing whether the state is adhering to its own requirements of its written execution procedures. As I was looking at the court hearing, Dr. Ruble seemed to be testifying, if this is unknown or if this is wrong, then there's this other problem. So it seemed like it was more based on concern that there was a lack of information as to the nature of the compound. What specifically did Dr. Ruble say that was known based on what was known about the compound would cause a problem? Well, my best recollection of his testimony is that he didn't specifically testify about any problems because of what was known about the compound. His testimony was more along the lines of what he didn't know about the compound and his testimony regarding potentialities and what could be. So it was really more about what he didn't know than what he did know. And again, the type of information that he stated was lacking, there's nothing in the execution procedures or the settlement agreement that requires the state to provide that type of information. With regard to the settlement agreement specifically, if additional information like that was something that the plaintiffs in that case had wanted to be required, well then they could have negotiated for that, but they did not. So the state provided quantitative information in a beyond use state as specified by the state's pharmacist and the state's position is the execution protocol doesn't require anything more. Is that correct? That is correct, Ron. That is correct. I can address the standing issue with respect to the dismissed claims. The issue before the court is whether or not they're standing. The question of waiver, the holding of Stewart v. LeGrand is not before the court. And I don't think the fact that there's no authority to suggest that because a party taking an affirmative action would waive some kind of a claim or a challenge means that that somehow creates standing that doesn't exist otherwise. And that's really, I think what the argument is here is that somehow the fact that a challenge to lethal gas would be waived by affirmatively selecting it somehow means that he has to have standing to challenge it without selecting that method. But ultimately, if this court were to or this quarter or any court, the district court, for example, were to look at the challenge to lethal gas, that would be an advisory opinion because it's not to be used in this execution. So I mean, I don't see any theory by which the district court erred by finding there was a lack of standing on those claims. How then would a defendant have standing to challenge the type of gas if the defendant's not put in this conundrum of either a default or choosing something and then losing that challenge? I mean, how would it be able to come up to the courts? Under this scenario, I'm not sure that it would, Your Honor. But again, I think that if a defendant believes that there is a constitutional problem with the type of gas the state intends to use, then the solution is to not select that method because there is a perfectly constitutional method that will be used otherwise. Here, lethal injection. And unless the court has any further questions, we would request that the court affirm the judgment of the district court. Any further questions? No? All right, Mr. Berkovich, you have some additional time. Thank you. It's far from a perfectly constitutional option. Obviously, we spent a great deal of time here today in litigation with the problems with respect to lethal injection for Mr. Atwood. That is why we've insisted on a constitutional gas option. There is explicitly mandatory language in the Arizona Constitution that flows from Mr. Atwood's entitlement to choose between gas and an injection. The state's off the table. And there is no means to challenge that other than what we have done here, which is provide demand letters before that grieve in the prison process and then bring suit. There's nothing more that can be done. This is going to recur for, I'm told, from amicus briefing, 32 additional people who face this option. The medical problem. Just a quick question. As I was trying to go through the state of the case law, it seemed to me that it remained at present. It's gone back and forth in our circuit, but at present, it's an open issue whether cyanide gas is constitutional or not constitutional. Am I correct? Or has there been some determinative opinion on that? You're, I believe, pointing to the jurisprudence that is really sort of embalmed from the 1990s since Fiorillo versus Gomez. In other words, the vacature of the decision coming out of the Ninth Circuit because of the amendment of the California statute that supplanted gas with lethal injection sort of ended any sort of further inquiry until now, over 20 years later, of course, with Arizona putting forward cyanide gas in a context where the last time they had conducted lethal injection was such a botched situation, there was meaningful concern to actually put gas back into the equation. Their protocols, Arizona's protocols, had not contemplated gas for 20 years until recently as a result. The problem is they've reverted to cyanide gas, which the last merits determination from any circuit court is this one, where it was affirming the Northern District of California's determination after a trial that cyanide gas is unconstitutional. And in Legrand versus Stewart, the Ninth Circuit also found that by virtue of assent from the Arizona Attorney General, that there was no factual difference between California cyanide gas and Arizona cyanide gas. So the problem is with the need for a gas option to be available for at least 15 other men on the list of 20 that the Attorney General has flagged where they will seek execution, this has, there has to be some means to challenge the designation. So just play out if he had chosen gas but also said cyanide gas is unconstitutional, and then that turned out to the court looking at the challenge would say, well we agree with that cyanide gas is unconstitutional. Wouldn't that be a way to challenge it? By electing that with the law as it stands, it would be a way to ensure that he would be put in, strapped into a gas chamber. We would be risking that kind of execution with a gambit. There's certainly no safe harbor in the jurisprudence at all. We would like to force the issue. We've tried to force the issue. There's no way to force the issue. He's going to be strapped to a table as it stands here. Is there no administrative way in the way went through, you know, in California and the death penalty to challenge that? No, Your Honor, the APA in Arizona precludes challenges to the Department of Corrections. We would have done that and we looked hard at that. If I also may ask, address the Eighth Amendment issue with regard to the drugs. There's been an assertion that we're not raising that claim. The problem is we have no visibility with respect to these drugs and there's been assertions about a BUD. We received a declaration, an anonymized declaration on May 24th putting forward the BUD and that was not from the pharmacist. That was from a Department of Corrections person. So this pharmacist has not averred to the BUD in question here for Mr. Atwood. The opacity precludes us from being able to make a meaningful treatment of what we're looking at other than the fundamental question of are these processes reliable? Justice McKeown, you pointed to 2021 where representations were made about the pharmacist saying there's a 90 day beyond use date. And then after the litigation in the Arizona Supreme Court, there was a retraction saying testing needed to be done in order to get a longer date. And so the state came back in the court this year saying we have a longer date. Trust us. They put forward nothing. Then in the Dixon litigation, it came forward because a district judge ordered production of this testing information that in fact the testing was inadequate. So there's a BUD that's relied on from this specialized testing that's inadequate. The premise is faulty. So going on that, the question is, is the state adhering to this basic pretty straightforward requirement, this legal obligation that the state has insisted obliges them to go to the Arizona Supreme Court and demanded a short circuiting of the process. The BUD here they submitted is an extended BUD because the testing can be relied on. The testing cannot be relied on. And absent that, and absent a better showing of the basis for why it can be relied on, they're left with the empiric BUD. That's the default figure, which if it's in normal conditions, it's a three-day window. These drugs were prepared two months ago. They've expired. That's what we know. Anything further? Your Honor, we could spend the afternoon in these topics. I most want to entertain further questions that you may have on these complicated matters. But hopefully we put under the difficult circumstances of the briefing for both sides, we've armed the court with enough to handle these discrete issues with regard to standing and with respect to the drugs issues and the restraint. Thank you. Yes, I want to say that I think all of the issues have been quite fairly and honestly aired. Also, the district court, as you know, had a very extensive hearing on this. So we have the benefit of that hearing as well. I do want to ask one question on the religious protocol. My understanding is that there has been some supplemental filings in that today, but as yet there's no decision. Is that correct? Yes, Your Honor. That sums it up at the moment. All right. So at this point, we don't know whether there'll be an appeal because we don't have an order to know what the ruling of the district court is. Is that correct? Correct. The parties have worked together to resolve many issues. And I want to credit the state in that vein. But there are open issues that have not been sorted by the court fully. All right. Well, there's still time. So we hope that you'll continue to work toward resolution if possible. And if not, of course, we would hear an appeal from that. So I do want to thank both of you, both for your briefing and for your very well informed oral argument today. The case just argued of Atwood versus Shin is submitted and we're adjourned. This court for this session stands adjourned.
judges: McKEOWN, CALLAHAN, IKUTA